Downing v. Cycle Holdings, Inc., 2023 NCBC 10.

STATE OF NORTH CAROLINA

WAKE COUNTY

ADAM J. DOWNING,

        Plaintiff,

        v.

CYCLE HOLDINGS, INC., a North Carolina corporation; and CYCLE LABS, INC., a Delaware corporation,

        Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
22 CVS 10511

**ORDER AND OPINION ON CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT
[PUBLIC]**[1]

THIS MATTER comes before the Court on the parties' cross-motions for partial summary judgment.  The Court, having considered the motions, the parties' briefs, the arguments of counsel, the applicable law, and all appropriate matters of record, **CONCLUDES** that partial summary judgment should be **GRANTED** for Defendants.

*Narron Wenzel, P.A., by Benton Sawrey, for Plaintiff Adam J. Downing.*

*Ellis & Winters LLP, by Steven Scoggan and James M. Weiss, for Defendants Cycle Holdings, Inc. and Cycle Labs, Inc.*

### INTRODUCTION

1.    Plaintiff Adam J. Downing, a shareholder of Cycle Holdings, Inc. ("Cycle Holdings"), a North Carolina corporation, filed this action pursuant to N.C.G.S. § 55-

---

[1] Recognizing that this Order and Opinion cites and discusses the subject matter of documents that the Court has allowed to remain filed under seal in this action, the Court elected to file this Order and Opinion under seal on 12 January 2023. The Court then permitted the parties an opportunity to propose redactions to the public version of this document.  The Court has accepted the redactions jointly proposed by the parties.

16-04 seeking an order allowing him to inspect the corporate records of a separate—but related—entity, Cycle Labs, Inc. ("Cycle Labs"), a Delaware corporation.[2] This matter is presently before the Court on the parties' joint request for a determination by the Court of a key threshold issue that is highly relevant (and potentially dispositive) to the relief Downing is seeking in this action—namely, whether Cycle Holdings actually has the power to elect, appoint, or designate a majority of Cycle Labs' directors for purposes of N.C.G.S. § 55-16-02(h).[3] The resolution of that issue requires the Court to apply Delaware law regarding the enforceability of a voting agreement between a company's shareholders that purports to restrict the majority shareholder's exercise of its right to appoint directors as set out in the company's certificate of incorporation.

## FACTUAL AND PROCEDURAL BACKGROUND

2. "The Court does not make findings of fact on motions for summary judgment; rather, the Court summarizes material facts it considers to be uncontested." *McGuire v. Lord Corp.*, 2021 NCBC LEXIS 4, at *3 (N.C. Super. Ct. Jan. 19, 2021).

3. Cycle Holdings is a corporation organized under the laws of the State of North Carolina with its principal place of business in Wake County, North Carolina. (Compl. ¶ 2, ECF No. 3; Answer ¶ 2, ECF No. 7.)

---

[2] Cycle Holdings and Cycle Labs are the two named Defendants in this action.

[3] As discussed below, the Court—with the agreement of the parties—elects to treat the parties' joint request as cross-motions for partial summary judgment.

4.     Cycle Labs is a foreign corporation organized under the laws of the State of Delaware.  (Compl. ¶ 8; Answer ¶ 8.)  Cycle Labs develops and markets test automation software for commercial enterprise systems.  (Compl. ¶ 8; Answer ¶ 8.)

5.     Downing is one of three shareholders of Cycle Holdings.  (Compl. ¶ 7; Answer ¶ 7.)  Downing "owns more than 5% of the shares of stock in Cycle Holdings and has been a shareholder for at least six months prior to the initial inspection demand being made on March 17, 2022."  (Compl. ¶ 7; Answer ¶ 7.)

6.     Cycle Holdings' other shareholders are Jeffrey Williams and Joshua Owen.  (Compl. ¶ 10; Answer ¶ 10.)  Williams is a member of the board of directors of both Cycle Holdings and Cycle Labs.  (Compl. ¶ 10; Answer ¶ 10.)  Owen is the majority shareholder of Cycle Holdings, serves on the board of directors of both Cycle Holdings and Cycle Labs, and serves as the chief executive officer of both Cycle Holdings and Cycle Labs.  (Compl. ¶ 10; Answer ¶ 10.)

7.     Cycle Holdings is a shareholder of Cycle Labs.  (Compl. ¶ 8; Answer ¶ 8.)  The Complaint asserts that "Cycle Holdings exists, for all intents and purposes, as an entity to hold shares of stock in Cycle Labs."  (Compl. ¶ 8.)  In their Answer, Defendants "[a]dmitted that Cycle Holdings' only asset is its shares of stock in Cycle Labs."  (Answer ¶ 16.)

8.     The Complaint alleges that until January 2022, Cycle Holdings was the sole shareholder of Cycle Labs.  (Compl. ¶ 9.)

9.     On 14 January 2022, Downing received notice from Cycle Holdings that it had taken action to convert Cycle Labs from a North Carolina corporation to a

Delaware corporation in contemplation of an investment in Cycle Labs by an entity called Jurassic Growth Fund I ("Jurassic Capital"). (Pl.'s Initial Br., at 2, ECF No. 12.)

10. Downing learned through a U.S. Securities and Exchange Commission filing that, at some point in January 2022, Jurassic Capital invested $2,500,000 in Cycle Labs in exchange for an equity interest in the company. (Compl. ¶ 13; Answer ¶ 13.) In addition, Downing alleges that additional stock (or stock options) have been sold or issued to other third parties since July 2021. (Compl. ¶ 14.)

11. Downing asserts that "[b]ecause Cycle Holdings' shares of stock in Cycle Labs are its sole asset, any third-party investment into Cycle Labs will have a substantive effect on the value of the company and ultimately the value of Plaintiff's shares of stock in Cycle Holdings." (Compl. ¶ 16.) In his Complaint, Downing states that "[i]t is possible that the investment [by Jurassic Capital] created some form of preferred equity or obligation for repayment that may have a materially adverse future effect on Cycle Holdings." (Compl. ¶ 16.)

12. As a result of Jurassic Capital's investment, "Cycle Holdings' ownership percentage in Cycle Labs is less today than it was prior to Jurassic Capital's investment in January 2022." (Answer ¶ 16; Compl. ¶ 16.)

13. After learning of Jurassic Capital's investment, Downing sent Cycle Holdings a letter dated 17 March 2022 requesting inspection of certain records of Cycle Holdings and Cycle Labs ("Inspection Demand").[4] (Compl. ¶¶ 17–18; Answer

---

[4] Downing's Inspection Demand included the following categories of records: (a) a list of all of Defendants' officers and directors, with name, position, and contact information (address,

¶¶ 17–18.) Downing asserts that the Inspection Demand was made in good faith and for a proper purpose—i.e., "to understand the nature of a third-party investment in Cycle Labs, to determine the value of Plaintiff's shares of stock in Cycle Holdings, and determine the present financial condition of Defendants." (Compl. ¶ 19.)

14. On 12 May 2022, counsel for Defendants—pursuant to a nondisclosure agreement between Downing and Defendants—provided Downing with some (but not all) of the documents requested in the Inspection Demand. (Compl. ¶¶ 22–23; Answer ¶¶ 22–23.) Specifically, Defendants informed Downing of their refusal to provide the documents requested regarding both Cycle Labs and Jurassic Capital's investment in Cycle Labs. (Compl. ¶ 23; Answer ¶ 23.)

15. As a result, Downing "raised his concern about the omitted items and restated his demand and sought to informally resolve the issue directly with

phone number, email); (b) certain financial statements of Defendants from 1 January 2021 forward; (c) any of Defendants' financial projections that may be available for the next twelve (12) months, by month, and annual projections for 2023, 2024, and 2025 (if available); (d) minutes of all meetings and records of any action taken by the board of directors or any committee of Defendants; (e) minutes of all Defendants' stockholder meetings and records of any action taken by Defendants' shareholders; (f) all transaction documents, presentations, and any other materials associated with raising and completing the funding by any additional investors, including, but not limited to, Jurassic Capital's investment closed in or around January 2022; (g) a table reflecting Defendants' current stock capitalization, including names, share count, and share class; (h) a current list of all stock options issued by Defendants, including optionee name, share count, strike price, share class, and date of grant; (i) a summary/transaction ledger of all Defendants' stock transactions since formation of the Defendant corporations, including detail of the stockholder, share count, transaction type, purchase/sale price, and date of transaction; (j) a list of customers and its related reseller (if applicable), with revenue summarized by type (software, services, reimbursed expenses, etc.), that (i) account for Cycle Labs' top ten (10) customers or (ii) any customer that attributes more than five percent (5%) of revenue, and have conducted business with Cycle Labs in the prior twelve (12) months; (k) any stock valuation reports of Defendants; (l) Defendants' bylaws or restated bylaws and all amendments currently in effect; and (m) Defendants' articles of incorporation and any amendments to them currently in effect. (Compl. ¶ 18.)

Defendants and Defendants' other shareholders and directors." (Compl. ¶ 24.) Downing asserts that, "[i]n spite of his efforts, Defendants have refused to provide additional information and have taken the position that [Defendants are] not obligated to provide any records regarding Cycle Labs to the Plaintiff." (Compl. ¶ 24; Answer ¶ 24.)

16. On 10 August 2022, Downing, through counsel, sent a letter "to Defendants restating the demand for records relating to Cycle Labs and making a discrete written shareholder inspection demand for Cycle Labs' corporate records." (Compl. ¶ 27; Answer ¶ 27.) The 10 August letter largely reiterated Downing's previous Inspection Demand and sought additional information about any changes to previously disclosed information, as well as updated financial information from Defendants. (Compl. ¶¶ 27–28; Answer ¶¶ 27–28.)

17. However, the Complaint alleges that Defendants did not allow Downing to inspect any additional documents in response to the 10 August letter. (Compl. ¶ 29.)

18. Downing initiated this action by filing a Complaint on 19 August 2022 in Wake County Superior Court. (Compl., ECF No. 3.)

19. The Complaint alleges that Downing is a qualified shareholder of Cycle Holdings pursuant to N.C.G.S. § 55-16-02(g) and, as such, "is entitled to a complete accounting of the finances and business affairs of Cycle Holdings pursuant to N.C.G.S. § 55-16-01, *et seq.*[,]" including "a complete accounting of the finances and business affairs of Cycle Labs, which is an entity controlled by Cycle Holdings because

it is able to appoint, elect, or nominate a majority of the board of directors of Cycle Labs, pursuant to N.C.[G.S. §] 55-16-02(h)." (Compl. ¶ 38.)

20.    Defendants filed an Answer to the Complaint on 12 October 2022. (Answer, ECF No. 7.)

21.    On 24 October 2022, Defendants filed a Consent Motion to Establish Schedule on Plaintiff's Requests for Records Inspection.  (ECF No. 9.)  In that motion, Defendants—with the consent of Downing—asked the Court to establish a bifurcated briefing schedule with the first issue to be briefed concerning whether Cycle Holdings does, in fact, possess the ability to elect, appoint, or designate a majority of the board of directors of Cycle Labs.

22.    The North Carolina General Statutes require the Court to resolve shareholder inspection requests "on an expedited basis."  N.C.G.S. § 55-16-04(b) (2021).  As a result, the Court promptly held a Webex conference with counsel on 26 October 2022.  Following the conference, the Court entered an order granting the motion and setting out a briefing schedule.  (ECF No. 11.)

23.    Following full briefing by the parties, the Court held a hearing on 8 December 2022.  At the hearing, the parties asked that their joint request for a ruling on this threshold issue be treated by the Court as cross-motions for partial summary judgment pursuant to Rule 56 of the North Carolina Rules of Civil Procedure.  The parties have also represented that no factual disputes exist with regard to this issue.

24. The Court is satisfied that the material facts relating to the issue as to which the parties seek resolution are undisputed and that it is appropriate to treat the parties' respective contentions as cross-motions for partial summary judgment.

**LEGAL STANDARD**

25. It is well established that "[s]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law.'" *Morrell v. Hardin Creek, Inc.*, 371 N.C. 672, 680 (2018) (quoting N.C. R. Civ. P. 56(c)). "[A] genuine issue is one which can be maintained by substantial evidence." *Kessing v. Nat'l Mortg. Corp.*, 278 N.C. 523, 534 (1971). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible inference." *Daughtridge v. Tanager Land, LLC*, 373 N.C. 182, 187 (2019) (citation and internal quotation marks omitted).

26. On a motion for summary judgment, "[t]he evidence must be considered 'in a light most favorable to the non-moving party.'" *McCutchen v. McCutchen*, 360 N.C. 280, 286 (2006) (quoting *Howerton v. Arai Helmet, Ltd.*, 358 N.C. 440, 470 (2004)). "[T]he party moving for summary judgment ultimately has the burden of establishing the lack of any triable issue of fact." *Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 491 (1985) (citation omitted).

27. The party moving for summary judgment may satisfy its burden by proving that "an essential element of the opposing party's claim does not exist, cannot

be proven at trial, or would be barred by an affirmative defense, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of [the] claim[.]" *Dobson v. Harris*, 352 N.C. 77, 83 (2000) (citations omitted). "If the moving party satisfies its burden of proof, then the burden shifts to the non-moving party to 'set forth specific facts showing that there is a genuine issue for trial.' " *Lowe v. Bradford*, 305 N.C. 366, 369–70 (1982) (quoting N.C. R. Civ. P. 56(e)). If the nonmoving party does not satisfy its burden, then "summary judgment, if appropriate, shall be entered against [the nonmovant]." *United Cmty. Bank (Ga.) v. Wolfe*, 369 N.C. 555, 558 (2017) (quoting N.C. R. Civ. P. 56(e)).

## ANALYSIS

28. North Carolina's General Statutes provide that "[a] qualified shareholder of a corporation that has the power to elect, appoint, or designate a majority of the directors of another domestic or foreign corporation . . . has the inspection rights provided in this section with respect to the records of that other corporation." N.C.G.S. § 55-16-02(h) (2021). The inspection rights provided by Section 55-16-02 include the following:

> (a) A qualified shareholder of a corporation is entitled to inspect and copy, during regular business hours at the corporation's principal office, any of the records of the corporation described in G.S. 55-16-01(a), excluding minutes of meetings of, and records of actions taken without a meeting by, the corporation's board of directors and board committees established under G.S. 55-8-25, if the qualified shareholder gives the corporation written notice of the qualified shareholder's demand at least five business days before the date on which the qualified shareholder wishes to inspect and copy.

> (b) A qualified shareholder of a corporation is entitled to inspect and copy, during regular business hours at a reasonable location specified

by the corporation, any of the following records of the corporation if the qualified shareholder meets the requirements of subsection (c) of this section and gives the corporation written notice of the qualified shareholder's demand at least five business days before the date on which the qualified shareholder wishes to inspect and copy:

(1) Records of any final action taken with or without a meeting by the board of directors, or by a committee of the board of directors while acting in place of the board of directors on behalf of the corporation maintained in accordance with G.S. 55-16-01(a).

(2) Accounting records of the corporation.

(3) The record of shareholders maintained in accordance with G.S. 55-16-01(c).

(4) The financial statements of the corporation maintained in accordance with G.S. 55-16-01(b).

A shareholder of a public corporation is not entitled to inspect or copy any accounting records of the corporation or any records of the corporation with respect to any matter which the corporation determines in good faith may, if disclosed, adversely affect the corporation in the conduct of its business or may constitute material nonpublic information at the time the shareholder's notice of demand to inspect and copy is received by the corporation.

(c) A qualified shareholder may inspect and copy the records described in subsection (b) only if all of the following apply:

(1) The qualified shareholder's demand is made in good faith and for a proper purpose.

(2) The qualified shareholder describes with reasonable particularity the qualified shareholder's purpose and the records the qualified shareholder desires to inspect.

(3) The records are directly connected with the qualified shareholder's purpose.

N.C.G.S. § 55-16-02(a)–(c).

29.     Accordingly, if Downing is (i) a qualified shareholder of Cycle Holdings; and (ii) Cycle Holdings has the power to elect, appoint, or designate a majority of the

directors of Cycle Labs, then Downing possesses the inspection rights provided in Section 55-16-02 with respect to the records of Cycle Labs.

30. A "qualified shareholder" is "[a] person who has been a shareholder in the corporation for at least six months immediately preceding the shareholder's demand for inspection of records or who holds at least five percent (5%) of the corporation's outstanding shares of any class." N.C.G.S. § 55-16-01.1(3) (2021).

31. It is undisputed that Downing meets the statutory definition of "qualified shareholder" because he has both been a shareholder of Cycle Holdings for at least six months immediately preceding his demand for inspection and holds at least 5% of the corporation's outstanding shares of common stock. (Compl. ¶ 7; Answer ¶ 7.)

32. The parties' dispute instead concerns whether Cycle Holdings possesses the power to elect, appoint, or designate a majority of Cycle Labs' directors.

33. The parties agree that because Cycle Labs is a Delaware corporation, Delaware law controls this issue. *See Technik v. WinWholesale, Inc.*, 2012 NCBC LEXIS 5, at *9 (N.C. Super. Ct. Jan. 13, 2012) (applying Delaware law where corporation central to dispute was incorporated under the laws of Delaware).

34. Overall, there are 2,170,418 shares authorized of all classes of stock of Cycle Labs. (Certificate of Incorporation ["Certificate"], at 1, ECF No. 12.1.) Pursuant to Cycle Labs' Certificate, "[t]he total number of shares of all classes of stock which [Cycle Labs] shall have authority to issue is (i) 1,850,000 shares of Common Stock, $0.0001 par value per share ("**Common Stock**") and (ii) 320,418 shares of

Preferred Stock, $0.0001 par value per share ("**Preferred Stock**"). (Certificate, at 1 (emphasis in original).) The 320,418 shares of Preferred Stock are designated in the Certificate as "Series A Preferred Stock." (Certificate, at 2.)

35.    As of 21 January 2022, ownership of Cycle Labs' stock was as follows: Cycle Holdings owned [REDACTED] shares of Common Stock, representing a [REDACTED] ownership interest on a fully-diluted basis; Jurassic Capital owned [REDACTED] shares of Series A Preferred Stock, representing an [REDACTED] ownership interest on a fully-diluted basis; and "Other Investors" or "Individual Stock Holders" owned [REDACTED] shares of Common Stock, representing a [REDACTED] ownership interest on a fully-diluted basis. (Capitalization Table, at 1, ECF No. 12.3 (sealed), ECF No. 19.3; Valuation Report, at 42, ECF No. 12.2 (sealed), ECF No. 19.4.)

36.    The two key documents that are relevant to the issue currently before the Court are (1) Cycle Labs' Certificate, which was filed with the Delaware Secretary of State on 5 January 2022 (ECF No. 12.1.); and (2) a Voting Agreement entered into between Cycle Labs and its shareholders on 11 January 2022. (Voting Agreement, ECF No. 12.4 (sealed), ECF No. 19.5.)

37.    The Certificate provides, in pertinent part, that Cycle Labs' directors will be elected as follows:

> 3.2    Election of Directors. The holders of record of the shares of Series A Preferred Stock, exclusively and as a separate class on an as converted basis, shall be entitled to elect one (1) director of the Corporation ("the Series A Director") and the holders of record of the shares of Common Stock, exclusively and as a separate class, shall be entitled to elect three (3) directors of the Corporation[.]
>
> . . .

The holders of record of the shares of Common Stock and of any other class or series of voting stock (including the Series A Preferred Stock), exclusively and voting together as a single class, shall be entitled to elect the balance of the total number of directors of the corporation.

(Certificate, at 5–6.) Finally, the Certificate also provides that "[s]ubject to any additional vote required by this Certificate of Incorporation, the number of directors of the Corporation shall be determined in the manner set forth in the Bylaws of the Corporation." (Certificate, at 21.)

38. Accordingly, had the Voting Agreement not been subsequently entered, the present dispute would not exist. By the plain language of Section 3.2 of the Certificate, Cycle Holdings (as a result of its status as the holder of a majority of Cycle Labs' common stock) would be entitled to elect three of Cycle Labs' directors, which would constitute a majority.

39. However, the Voting Agreement contains additional language regarding the selection of Cycle Labs' directors. The Voting Agreement was executed on 11 January 2022 and was signed by the following: (i) Cycle Labs, Inc., by Joshua Owen, President and CEO; (ii) Cycle Holdings, Inc., by Joshua Owen, President, and Evan Edwards; and (iii) Jurassic Capital Growth Fund I, L.P., by Jurassic Capital Growth Fund I GP, LLC, its General Partner, by Joe Colopy, Manager. (Voting Agreement, at 16–19.)

40. Initially, the Recitals in the Voting Agreement reference the above-quoted provisions from the Certificate, stating in relevant part as follows:

B. The Certificate of Incorporation of the Company (as the same may be amended and/or restated from time to time, the "Certificate of Incorporation") provides that (a) the holders of record of

the shares of the Series A Preferred Stock, exclusively and as a separate class on an as converted basis, shall be entitled to elect one (1) director of the Company (the "Series A Director"); (b) the holders of record of the shares of common stock, $0.0001 par value per share, of the Company ("Common Stock"), exclusively and as a separate class, shall be entitled to elect three (3) directors of the Company (the "Common Director"); and (c) the holders of record of the shares of Common Stock and the Series A Preferred Stock, voting together as a single class on an as-converted basis, shall be entitled to elect the balance of the total number of directors of the Company (each, a "Joint Director").

(Voting Agreement, at 1.)

41.     The Voting Agreement then proceeds to fix the size of the board at five directors:

1.1     Size of the Board.  Each Stockholder agrees to vote, or cause to be voted, all Shares (as defined below) owned by such Stockholder, or over which such Stockholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that the size of the Board shall be set and remain at five (5) directors, and cannot be increased or decreased without the written consent of the holders of at least a majority of the shares of Common Stock then issued or issuable upon conversion of shares of Series A Preferred Stock, voting as a separate class on an as converted basis.  For purposes of this Agreement, the term "Shares" shall mean and include any securities of the Company that the holders of which are entitled to vote for members of the Board, including without limitation, all shares of Common Stock and Series A Preferred Stock, by whatever name called, now owned or subsequently acquired by a Stockholder, however acquired,     whether     through     stock     splits,     stock     dividends, reclassifications, recapitalizations, similar events or otherwise.

(Voting Agreement, at 1–2.)

42.     The provisions of the Voting Agreement that are most relevant to the

issue currently before the Court state as follows:

1.2     Board Composition.  Each Stockholder agrees to vote, or cause to be voted, all Shares owned by such Stockholder, or over which such Stockholder has voting control, from time to time and at all times, in whatever manner as shall be necessary to ensure that at each annual or special meeting of stockholders at which an election of directors is

held or pursuant to any written consent of the stockholders, subject to Section 5, the following persons shall be elected to the Board:

(a) One person designated from time to time by Jurassic Capital Growth Fund I, L.P. ("Jurassic"), for so long as such Stockholder and its Affiliates (as defined below) continue to own beneficially shares [REDACTED] of Common Stock (including shares of Common Stock issued or issuable upon conversion of Series A Preferred Stock), which individual shall initially be Kevin Mosley, and which director shall be the Series A Director;

(b) Two (2) persons designated from time to time by the record holders of a majority of the shares of outstanding Common Stock then held by Key Holders who are then providing services to the Company as officers, employees, or consultants (provided, however, that Cycle Holdings, Inc. ("Holdings"), shall be deemed to be a Key Holder providing services to the Company in satisfaction of the foregoing requirement so long as the individuals holding at least a majority of Holdings' outstanding capital stock are then providing services to the Company as officers, employees or consultants), which individuals shall initially be Jeffrey Williams and Evan Edwards, and which directors shall be two (2) of the Common Directors;

(c) As the third (3rd) Common Director, the Company's Chief Executive Officer, who as of the date of this Agreement is Joshua Owen (the "CEO Director"), provided that if for any reason the CEO Director shall cease to serve as the Chief Executive Officer of the Company, each of the Stockholders shall promptly vote their respective Shares (i) to remove the former Chief Executive Officer of the Company from the Board if such person has not resigned as a member of the Board; and (ii) to elect such person's replacement as Chief Executive Officer of the Company as the new CEO Director.

(d) One person who is not otherwise an Affiliate of the Company or any Investor, and who is mutually acceptable to the other directors, which seat shall initially be vacant, and which director shall be a Joint Director.

To the extent that any of clauses (a) through (d) above shall not be applicable, any member of the Board who would otherwise have been designated in accordance with the terms thereof shall

instead be voted upon by all the Stockholders of the Company entitled to vote thereon in accordance with, and pursuant to the Certificate of Incorporation.

(Voting Agreement, at 2.)

43. Thus, the Voting Agreement (like the Certificate) provides for three "Common Directors." However, the Agreement requires Cycle Holdings to vote its shares so that the Chief Executive Officer of Cycle Labs is the third Common Director—a requirement that is not contained in the Certificate.

44. The heart of the parties' disagreement concerns the effect of this provision on Cycle Holdings' power to elect, appoint, or designate a majority of Cycle Labs' directors.

45. Downing argues that Cycle Holdings—as the majority shareholder of Cycle Labs' common stock—"retains the right to elect or designate three of the five members of Cycle Labs' board of directors pursuant to [Cycle Labs'] Certificate of Incorporation . . . ." (Pl.'s Initial Br., at 1.) Furthermore, Downing contends that the Voting Agreement "ratifies and recognizes that the holders of the Common Stock have the exclusive right to select three directors." (Pl.'s Initial Br., at 5.) Downing asserts that any language in the Voting Agreement that purports to restrict the manner in which Cycle Holdings can exercise that right is invalid. This is so, Downing contends, because under Delaware law a contract between shareholders that conflicts with the company's charter by altering the voting power of those shareholders cannot be given effect. Simply put, Downing's argument is that the Voting Agreement is an invalid attempt to restrict Cycle Holdings' unfettered right to elect a majority of Cycle Labs'

directors as guaranteed in the Certificate and that any such change in Cycle Holdings' rights with regard to the composition of the board could only be effectuated through an amendment to the Certificate itself.

46. Defendants, conversely, contend that the Voting Agreement—which Cycle Holdings signed as a shareholder—does not conflict with the Certificate and simply contains permissible restrictions on how Cycle Holdings will exercise the voting rights granted to it in the Certificate. Defendants argue that the clear language of the Voting Agreement "restricts Cycle Holdings' power by only allowing it to select two directors and forcing it to vote Cycle Labs' current CEO into the third seat, regardless of his or her affiliation with Cycle Holdings." (Defs.' Resp. Br., at 2, ECF No. 16.) Thus, Defendants argue, "[a]t bottom, Cycle Holdings only has the power to select two of the five seats on Cycle Labs' board. Cycle Holdings does not have 'the power to elect, appoint, or designate a majority of the directors' of Cycle Labs." (Defs. Resp. Br., at 3 (quoting N.C.G.S. § 55-16-02(h) (2021)).)

47. Based on the plain language of the Voting Agreement, it is clear that if the Agreement is given effect Cycle Holdings lacks the power to elect, appoint, or designate a majority of Cycle Labs' directors. Instead, Cycle Holdings would only control two of the five members of the board—falling short of a majority. Therefore, the ultimate question to be resolved is whether under these circumstances the Voting Agreement is valid under Delaware law.

48.     Voting agreements are expressly authorized under the Delaware General Corporation Law ("DGCL").  With respect to voting agreements between shareholders, the DGCL provides as follows:

> An agreement between 2 or more stockholders, if in writing and signed by the parties thereto, may provide that in exercising any voting rights, the shares held by them shall be voted as provided by the agreement, or as the parties may agree, or as determined in accordance with a procedure agreed upon by them.

8 Del. C. § 218(c) (2022).

49.     The Delaware Supreme Court has made clear that shareholders possess significant flexibility in entering into such agreements.

> At its core, the [DGCL] is a broad enabling act that allows immense freedom for businesses to adopt the most appropriate terms for the organization, finance, and governance of their enterprise provided the statutory parameters and judicially imposed principles of fiduciary duty are honored.  In fact Delaware's corporate statute is widely regarded as the most flexible in the nation because it leaves parties to the corporate contract (managers and stockholders) with great leeway to structure their relationships, subject to relatively loose statutory constraints and to the policing of director misconduct through equitable review.

*Manti Holdings, LLC v. Authentix Acquisition Co.*, 261 A.3d 1199, 1217 (Del. Sep. 13, 2021); *see also Schreiber v. Carney*, 447 A.2d 17, 25 (Del. Ch. May 11, 1982) ("Delaware law has for quite some time permitted stockholders wide latitude in decisions affecting the restriction or transfer of voting rights.")

50.     This flexibility is not limitless, however.  "When evaluating corporate action for legal compliance, a court examines whether the action contravenes the hierarchical components of the entity-specific corporate contract, comprising (i) the Delaware General Corporation Law, (ii) the corporation's charter, (iii) its bylaws, and

(iv) other entity-specific contractual agreements, such as a stock option plan, other equity compensation plan, or, as to the parties to it, a stockholder agreement." *Quadrant Structured Prods. Co., Ltd. v. Vertin*, 2014 Del. Ch. LEXIS 214, at *9 (Del. Ch. Oct. 28, 2014). "Each of the lower components of the contractual hierarchy must conform to the higher components. A bylaw that conflicts with the charter is void, as is a bylaw or charter provision that conflicts with the DGCL." *Sinchareonkul v. Fahnemann*, 2015 Del. Ch. LEXIS 17, at *17 (Del. Ch. Jan. 22, 2015).

51. Neither the parties' briefs nor the Court's own research has disclosed any case in which a Delaware court has actually held that a shareholder voting agreement was invalid because it conflicted with the company's charter. Indeed, although there is no Delaware case law precisely on point, the two most similar cases decided by Delaware courts both support Defendants' position on this issue.

52. In *In re Westech Cap. Corp.*, 2014 Del. Ch. LEXIS 92 (Del. Ch. May 29, 2014), the Delaware Court of Chancery was tasked with deciding whether two subsections of a voting agreement—which determined how the agreement's signatories would designate directors—should be interpreted as either majority of shares or per capita voting provisions. *Id.* at *2. One of the two provisions provided that the Series A Preferred signatories agreed to vote, or cause to be voted, all of the shares they owned, or otherwise controlled, to ensure that "[t]wo persons elected by the Key Holders" would be elected to Westech's board of directors. *Id.* at *8. The court noted that this provision was ambiguous and that interpretation of the "provision turns on the appropriate definition to be applied to the term 'elected,'

which the drafters of the agreement did not define or contextualize." *Id*. at \*24, \*48. The court held that this provision was likely a per capita voting provision "because it appears to be a provision negotiated to empower certain individuals [i.e., the investors], without reference to their relative status as shareholders." *Id*. at \*24–25.

53.    In reaching this conclusion, the court stated the following in rejecting the plaintiff's arguments:

> [Plaintiff] next contends that Defendants' per capita voting theory would be invalid as a matter of law because the DGCL requires corporations to specify their election to use per capita voting in their charters. [Plaintiff] argues the plain language of 8 Del. C. § 212(a) requires such a result, as does the pertinent case law on point.  However, [Plaintiff]'s argument is inconsistent with the broad provisions found in 8 Del. C. § 218, allowing stockholders to "vote shares as provided by [their] agreement." *As recent case law has articulated, "the Charter and Bylaws allocate various rights to the different classes of stockholders, then the Stockholders' Agreement adds a contractual overlay that constrains the manner in which parties to that agreement can exercise their rights."*
>
> . . .
>
> The signatories to the Voting Agreement are permitted to agree to vote their shares (each of which has a one vote per share feature articulated in the Company's foundational documents) according to whatever terms they choose assuming they do not otherwise violate the terms of Section 218 or other Delaware law.
>
> *[Plaintiff] forwards a related argument, that the voting rights of the Voting Agreement's signatories are stated in the Company's Certificate of Designation, which provides for majority voting and thus the Court cannot find in Defendants' favor. [Plaintiff] correctly states the law, but the general statements he quotes only go so far.  The Certificate of Designation describes the mechanism for the election and permits each shareholder one vote per share.  The Voting Agreement does not inhibit its signatories from casting one vote per share; it simply binds them to cast each of those votes in accordance with the provisions found in the agreement.*

*Id*. at \*56–59 (emphasis added and footnotes omitted).

54.     The *Westech* court's description of the voting agreement at issue in that case as a "contractual overlay" to the company's charter and bylaws was based on the Court of Chancery's prior decision in *Klaassen v. Allegro Dev. Corp*, 2013 Del. Ch. LEXIS 247 (Del. Ch. September 27, 2013).  In *Klaassen*, the corporation amended and restated its certificate of incorporation and bylaws as part of a Series A Preferred Stock transaction.  In connection with the transaction, the corporation was made a party to a stockholders' agreement entered into by the Series A Investors and the founder of the corporation.  *Id*. at *4.  Overall, "[t]hese documents established a corporate governance structure in which [plaintiff] and the Series A Investors shared control at both the director and stockholder levels."  *Id*.

55.     One of the issues before the court in *Klaassen* was whether the plaintiff—as the holder of virtually all of the company's common stock and representing a majority of that company's outstanding voting power—permissibly acted by written consent to remove two incumbent directors, fill the two resulting vacancies, and fill a preexisting vacancy.  In addressing this issue, the Chancery Court stated as follows:

> Under this governance structure, the Charter and Bylaws allocate various rights to the different classes of stockholders, then the Stockholders' Agreement adds a contractual overlay that constrains the manner in which parties to that agreement can exercise their rights.  As the holder of the majority of Allegro's voting power, [Plaintiff] possesses rights under the Charter and Bylaws to elect directors, remove directors, and fill vacancies that he agreed not to exercise in the Stockholders' Agreement.

*Id*. at *70. The Court then explained the interplay between, on the one hand, the plaintiff's status as the holder of the majority of the voting power needed to remove directors and, on the other hand, the agreement which restricted that power:

> [Plaintiff] is a party to the Stockholders' Agreement. *By entering into the Stockholders' Agreement, [Plaintiff] agreed voluntarily not to exercise his power as holder of a majority of the corporation's outstanding voting power to remove the Remaining Directors without cause.* In Section 9.4 of the Stockholders' Agreement, [Plaintiff] and the other parties to the agreement committed "to vote, or cause to be voted, all Shares owned by such Stockholder, or over which such Stockholder has voting control, from time to time and at all times, in whatever manner as shall be necessary" such that, subject to two exceptions, no director elected pursuant to the Stockholders' Agreement "may be removed from office other than for cause." JX 10 § 9.4(a). *To reiterate, even though [Plaintiff] otherwise could remove a director without cause, he agreed in the Stockholders' Agreement not to do so unless one of two exceptions applies.*

*Id*. at *79–80 (emphasis added). Finally, in addressing the plaintiff's ability to unilaterally fill vacant positions based on his majority status, the Court of Chancery stated:

> By entering into the Stockholders' Agreement, [Plaintiff] limited his ability to fill vacancies. He agreed that he could not unilaterally fill an Outside Director vacancy and bound himself to support only nominees designated by the CEO and approved by the Series A Directors.

*Id*. at *85–86.

56. In the present case, the Court concludes that the reasoning of *Westech* and *Klaassen* compels a ruling in favor of Defendants. These cases demonstrate the critical distinction recognized under Delaware law between (1) an agreement that expressly takes away a power granted to a shareholder in the company's charter; and (2) an agreement that instead simply constrains the manner in which the shareholder exercises that power. Here, the Voting Agreement does the latter rather than the

former.  Although the Voting Agreement—which was signed by all shareholders, including Cycle Holdings—binds Cycle Holdings to vote its shares in accordance with the provisions contained therein regarding the election of Cycle Labs' third Common Director, it does not impermissibly conflict with the Certificate.  Instead, as in *Westech* and *Klaassen*, the Voting Agreement serves as "a contractual overlay that constrains the manner in which [Cycle Holdings] can exercise [its] rights" under the Certificate.  *See Westech*, 2014 Del. Ch. LEXIS 92, at *57.

57.     Thus, the Court concludes that the Voting Agreement is valid under Delaware law.

58.     As a result, Cycle Holdings does not have the power to elect, appoint, or designate a majority of Cycle Labs' board of directors for purposes of N.C.G.S. § 55-16-02(h).  As such, Defendants are entitled to summary judgment on this issue.

## CONCLUSION

59.     **THEREFORE, IT IS ORDERED** that partial summary judgment is **GRANTED** for Defendants.

60.     The parties are **DIRECTED** to jointly submit to the Court on or before 22 February 2023 their respective positions on what additional issues, if any, remain for resolution by the Court in this matter.

SO ORDERED, this the 1st day of February, 2023.

/s/ Mark A. Davis
Mark A. Davis
Special Superior Court Judge for
Complex Business Cases